UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| CHRISTINA JONES, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>HENRYVILLE CORRECTIONAL )<br>FACILITY, )<br>)<br>Defendant. ) | 4:14-cv-00132-RLY-TAB |

**ENTRY ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, Christina Jones, worked as a correctional officer at the Indiana Department of Correction's ("IDOC") Henryville Correctional Facility, the Defendant herein, from September 2011 through May 2015. Plaintiff alleges she asked to transfer from the evening/night shift to the day shift, but was denied the transfer because it was a "male" position. Plaintiff alleges Henryville discriminated against her on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff's gender claim is brought under two theories—disparate impact (Count I) and disparate treatment (Count II).

Henryville now moves for summary judgment on Plaintiff's disparate impact and disparate treatment claims, and Plaintiff cross moves for summary judgment on her disparate impact claim. For the reasons set forth below, Defendant's motion is **GRANTED** and Plaintiff's motion is **DENIED**.

1

**I.      Background**

Plaintiff began working as a correctional officer at Henryville on September 11, 2011. (Filing No. 44-1, Deposition of Christina Jones ("Plaintiff Dep.") at 10). Henryville is a minimum security male prison facility within the IDOC. (*Id.* at 65). During the time that Plaintiff worked at the facility, it housed between 170-200 inmates, and employed 34 custodial staff. (*Id.* at 65-66). Of the 34 custodial staff, 28 were male. (*Id.* at 66).

In 2011, custody staff were generally assigned to one of three shifts: midnight to 8:00 a.m. (first shift), 8:00 a.m. to 4:00 p.m. (second shift), or 4:00 p.m. to midnight (third shift). (Filing No. 44-2, Deposition of William Bischof ("Bischof Dep.") at 24). Custody staff were scheduled on a monthly basis, with a six day on, two day off rotation. (*Id.*). In addition to regular custody officers, Henryville employed road crew officers and utility officers, who worked a Monday through Friday 8:00 a.m. to 4:00 p.m. shift. (Filing No. 44-3, Defendant's Position Statement at 3). The road crew officers accompanied inmates who worked outside of the facility during the day; the utility officers assisted the road crew with supervision, and also helped strip search the inmates when they returned to the facility. (Bischof Dep. at 25). During the time that Plaintiff worked at Henryville, Lieutenant William Bischof was responsible for scheduling. (*Id.* at 24).

Lt. Bischof employed a practice of placing no more than three female officers on any shift. (*Id.* 31-32). He employed this practice in part[1] because IDOC Policy No. 02-03-101, entitled "Searches and Shakedowns," prohibits cross-gender searches, except to prevent the imminent loss of contraband. (*Id.* at 42-43). He adopted this practice because in the past, there were several occasions when a male correctional officer was absent, leaving him with an all-female staffed shift. (*Id.* at 48-50). On those occasions, he had to ask a male correctional officer to work overtime to cover the shift. (*Id.* at 50).

When Plaintiff was hired, she requested to work days, but she agreed to work any shift to which she was assigned. (Plaintiff Dep. at 11-12). Plaintiff was originally assigned third shift (4:00 p.m. to midnight). (*Id.* at 18). In December 2011, Plaintiff asked Lt. Bischof to switch to the day shift. (*Id.* at 20). Lt. Bischof responded that he could not put her on days because it was a "male position." (*Id.*). Around the same time, Plaintiff sent an email to Lt. Bischof requesting a switch to the midnight to 8:00 a.m. shift, because her current schedule made it difficult to spend time with her twelve year-old daughter. (*Id.* at 19). Plaintiff requested the day shift three other times during her employment, and each time, she was denied the request because there were already three women scheduled for the day shift. (*Id.* at 21-23, 36, 39-40).

In August 2013, Lt. Bischof re-assigned two female sergeants from the day shift, which created an opening for Plaintiff to move to days. (*Id.* at 62-64). Plaintiff accepted

---

[1] In considering requests for shift changes, Bischof testified that he also considered the officer's seniority. (Bischof Dep. at 30-32).

3

the transfer to the day shift (which switched to 6:00 a.m. to 2:00 p.m.), where she stayed until she voluntarily left her employment with the IDOC in April 2015.  (*Id.* at 8, 32).

Plaintiff alleges that officers on the day shift had a greater opportunity to work overtime hours, and took advantage of it.  (*See* Filing No. 44-5, Summary of Regular and Overtime Hours; *see also* Filing No. 47-1, Declaration of Eric Jones).  Consequently, she alleges she did not receive the same opportunity for overtime pay due to Henryville's scheduling policy.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The facts of this case are largely undisputed.[2]  Therefore, disposition of this case on a motion for summary judgment is particularly appropriate.

## III. Discussion

Henryville does not contest that Lt. Bischof denied Plaintiff's requests to transfer to the first shift because of her gender.  It claims, however, that Lt. Bischof's gender-based scheduling practices are consistent with Title VII because gender is a bona fide occupational qualification ("BFOQ") for correctional officer positions at Henryville. Plaintiff argues that Henryville's BFOQ defense should be stricken and, in any event,

---

[2] Henryville disagrees with Plaintiff's computation of overtime for members of the first shift. The issue of overtime is relevant to whether Plaintiff suffered an adverse employment action. The court did not address whether Plaintiff suffered an adverse employment action, and instead focused on Henryville's affirmative defenses.

4

Henryville failed to meet its burden of establishing that this qualification was reasonably necessary for its normal operation.

### A.     Motion to Strike

The parties filed their motions for summary judgment on the same day—April 6, 2016. In her response brief, Plaintiff filed a motion to strike Henryville's affirmative defenses of BFOQ and business necessity for Henryville's failure to comply with Section II.D of the Case Management Plan ("CMP"). That section of the CMP provides:

> Within 14 days after the non-expert discovery deadline, and consistent with the certification provisions of Fed. R. Civ. P. 11(b), the party with the burden of proof at trial shall file a statement of the claims or defenses it intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based.

(Filing No. 14, CMP at 2). The CMP further provides that the failure to comply with any of its provisions "may result in sanctions for contempt, or as provided under Rule 16(f), to and including dismissal or default." (*Id.* at 10).

Henryville admits it failed to file a statement of its claims and defenses as required by the CMP. Nevertheless, it argues this omission should be excused because Plaintiff addressed the merits of Henryville's BFOQ defense in her motion for summary judgment. This is a significant fact because the parties filed cross motions for summary judgment on the same day. She only moved to strike the BFOQ and business necessity defenses in her *response* to Henryville's motion for summary judgment. Thus, Henryville argues, Plaintiff was fully aware of Henryville's BFOQ defense and was not, therefore, prejudiced by its assertion of those defenses in its summary judgment motion. The court agrees. *Hollis v. Defender Sec. Co.*, No. 1:09-cv-1178-WTL-JMS, 2010 WL

5

1137485, at *2 (S.D. Ind. March 19, 2010) (granting motion to extend CMP initial disclosure deadlines in part because the plaintiff was not prejudiced). Plaintiff's motion to strike is therefore **DENIED**.

    **B.**    **Gender Discrimination**

        **1.**    **Disparate Treatment**

Title VII makes it an unlawful employment practice for an employer "to limit, segregate, or classify his employees" in a way that would deprive or limit their employment opportunities because of their sex. 42 U.S.C. § 2000e-2(a)(2). An exception exists, however, if the employees' sex is a BFOQ "reasonably necessary to the normal operation of that particular business or enterprise." *Id.* § 2000e-2(e). This exception is an extremely narrow one which "is valid only when the essence of the business operation would be undermined by not hiring members of one sex exclusively." *Dothard v. Rawlinson*, 433 U.S. 321, 333-34 (1977); *see also Henry v. Milwaukee Cty.*, 539 F.3d 573, 579 (7th Cir. 2008); *Torres v. Wisc. Dep't of Health and Social Servs.*, 859 F.2d 1523, 1527 (7th Cir. 1988). Because prison officials face unique and difficult challenges in achieving the goals of the criminal justice system—"'to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law-abiding citizens'"—their decisions are entitled to some deference. *Henry*, 539 F.3d at 580 (quoting *Torres*, 859 F.2d at 1529). "Accordingly, although the decisions of prison officials are not accorded as much deference in Title VII cases as they are in constitutional cases, their decisions 'are entitled to substantial weight when they

are the product of a reasoned decision-making process, based on available information and experience.'" *Id.* (quoting *Torres*, 859 F.2d at 1532).

According to Henryville, Lt. Bischof's scheduling policy ensures each male prisoner's constitutional right to privacy is protected by limiting the possibility of cross-gender strip searches to emergency situations only, per IDOC guidelines. It also ensures female officers will not be put in a position of violating IDOC policy by performing a non-emergency strip search on a male offender, or foregoing the non-emergency strip search all-together, thereby putting the safety and security of the facility in jeopardy.

Plaintiff attacks Lt. Bischof's scheduling policy on three grounds. First, she argues that it is not reasonably necessary to protect inmates' privacy because Henryville employs female correctional officers on every shift, including the day shift. Plaintiff's argument fails to appreciate the reason behind the policy. Lt. Bischof, like many prison administrators, was faced with the conflict between the right of females not to be discriminated against in job opportunities within Henryville because of their gender, and the right of inmates to avoid "unwanted intrusions by persons of the opposite sex." *Smith v. Fairman*, 678 F.2d 52, 55 (7th Cir. 1982). As noted by the Seventh Circuit, "[t]he resulting conflict between these two interests has normally been resolved by attempting to accommodate both interests through adjustments in scheduling and job responsibilities for the [correctional officers]." *Id.* The adjustments of schedules is the exact balancing that was done here in the interest of security and inmate privacy. Lt. Bishof employs female correctional officers on every shift while ensuring that male correctional officers are available to perform strip searches.

Second, she argues his scheduling policy is not entitled to deference because it is not the product of a reasoned decision-making process. Plaintiff complains that he "did not consult any records to see how frequently [strip searches] actually happened; he did not consult the facility's strip search logs to determine the frequency of non-emergency strip searches on each particular shift; he did not consult with the lieutenant who preceded him; and he did not consult any reports, studies, articles, or other materials." (Filing No. 43, Plaintiff's Memorandum in Support at 17). Instead, she continues, he instituted the policy only after experiencing an all-female staff between two and ten times. (Bischof Dep. at 50 (Q: "And how often did [an all-female staff] happen during the time you worked at Henryville Correctional Facility? . . . . One time? Two times?" A: "I honestly – I think it was more than that, but I don't think that it was a lot, a lot meaning more than ten probably . . . .")).

"[T]here is no general requirement that the necessity of a BFOQ be established by [objective or empirical] evidence." *Torres*, 859 F.2d at 1531. Rather, it may be established based on "a common-sense understanding of penal conditions, and, implicitly, on a limited degree of judicial deference to prison administrators." *Id.*

A common-sense understanding of the penal conditions at Henryville includes the possibility of a non-emergency strip search on any given shift. The necessity of the BFOQ was established by virtue of IDOC policy that forbids female officers from performing strip searches of male offenders, except in emergency situations. (Bischof Dep. at 47 (testifying his job is "to ensure that [the strip search] policy is followed by myself and others in my chain of command")). As noted by Henryville, Lt. Bischof's

8

scheduling policy ensures each male prisoner's constitutional right to privacy is protected by limiting the possibility of cross-gender strip searches to emergency situations only, per IDOC guidelines. It also ensures female officers will not be put in a position of violating IDOC policy by performing a non-emergency strip search on a male offender, or foregoing the non-emergency strip search all-together. Because Lt. Bischof's "business is planning for what if," (*id.* at 59), following IDOC policy, and ensuring the safety and security of the inmates and the officers, there is a basis in fact for limiting the number of female correctional officers on each shift. Lt. Bischof's scheduling policy was, therefore, "the product of a reasoned decision-making process, based on available information and experience," and is entitled to substantial weight.

Lastly, Plaintiff argues there were other reasonable alternatives than limiting shifts to three females. *See also E.E.O.C. v. Sedita*, 816 F.Supp. 1291, 1295 (N.D. Ill. 1993) (employer must show that "no reasonable alternatives exist to protect the privacy interests other than the gender-based hiring policy"). For example, Lt. Bischof could have asked a male officer from a prior shift to work overtime. But again, Lt. Bischof's job required him to follow IDOC policy and to balance the privacy rights of inmates against the right of female correctional officers not to be discriminated against in job opportunities. He determined, based on his experience, that limiting shifts to three female correctional officers was the appropriate way to accommodate those interests. (Bischof Dep. at 61 (testifying he thought his staffing policy was best for the facility). The court defers to his business judgment. Accordingly, summary judgment in favor of Henryville on Plaintiff's disparate treatment claim is warranted.

9

### 2. Disparate Impact

Title VII's prohibition of gender discrimination precludes an employer from "us[ing] a particular employment practice that causes a disparate impact on the basis of [gender]." 42 U.S.C. § 2000e-(k)(1)(a)(A)(i). Disparate impact claims differ from disparate treatment claims under Title VII because disparate treatment claims require proof of intentional discrimination. *Adams v. City of Indianapolis*, 742 F.3d 720, 731 (7th Cir. 2014). As the Seventh Circuit made clear in *Adams*, disparate impact claims can proceed on the basis of any employment practice, not just practices that are facially neutral. *Id.* at 731-32 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988)).

A prima facie case under the disparate impact theory requires the plaintiff to "isolate and identify the specific employment practices that are allegedly responsible for any observed statistical disparities." *Cerutti v. BASF Corp.,* 349 F.3d 1055, 1067 (7th Cir. 2003). The plaintiff must also present "'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 717 (7th Cir. 2012) (quoting *Watson,* 487 U.S. at 994-95). If the plaintiff presents sufficient statistical evidence, the burden shifts "to the defendant-employer to demonstrate that the employment practice is job related for the position in question and consistent with business necessity." *Id.* (internal quotations omitted) (quoting 42 U.S.C. § 2000e–2(k)(1)(A)). "If the employer satisfies this requirement, the

burden shifts back to the plaintiff to show that an equally valid and less discriminatory practice was available that the employer refused to use." *Id.*

Henryville argues Plaintiff failed to establish a prima facie case of disparate impact because she presents no evidence that female correctional officers were statistically less likely to receive their desired shift compared to their equally qualified male counterparts. Plaintiff argues she does not need to present statistical evidence in light of Lt. Bischof's admission that he would not consider transferring a female correctional officer to an open shift if that shift was already staffed with three women. (Bischof Dep. at 36). The problem here is not so much with statistics—or the lack thereof—as much as the complete lack of evidence that the scheduling policy at issue has negatively impacted female correctional officers "because of their membership in a protected class." *Puffer*, 675 F.3d at 717. Simply establishing Henryville's quota of three female correctional officers per shift is not enough. But even were she to establish her prima facie case, for the reasons explained above in support of Henryville's BFOQ defense, the court finds Henryville is entitled to the business necessity defense.

## IV. Conclusion

The court finds Henryville met its burden of establishing that the sex-based classification at issue here was reasonably necessary to comply with the IDOC's prohibition on cross-gender strip searches in non-emergency situations. Accordingly, Plaintiff's claims for gender discrimination under disparate impact and disparate treatment theories cannot survive summary judgment. Defendant's Motion for Summary Judgment (Filing No. 39) is therefore **GRANTED** and Plaintiff's Motion for Summary Judgment (Filing No. 42) is **DENIED**.

**SO ORDERED** this 14th day of November 2016.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.